**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MISSOURI**
**CENTRAL DIVISION**

GREAT AMERICAN ALLIANCE     )
INSURANCE COMPANY,     )
    )
           Plaintiff,     )     No. 2:16-cv-04046-NKL
    )
    vs.     )
    )
WINDERMERE BAPTIST CONFERENCE     )
CENTER, INC., et al.,     )
    )
           Defendants.     )
    )

## ORDER

This case principally concerns whether Defendants, Windermere Baptist Conference Center and Kendra Brown, have insurance coverage under a Great American policy for potential liability in a suit pending in Morgan County. In that case, damages are being sought against them for injuries sustained by Karlee Richards after she fell while zip-lining at The Edge, a ropes course at Windermere's Conference Center. Kendra Brown was an employee of Windermere, working at the Edge at the time of the accident.

In June 2014, Karlee Richards and her Searcy Baptist Church youth group were attending a summer camp at Windermere's Conference Center, which was sponsored by Lifeway Christian Resources of the Southern Baptist Conference, d.b.a. Student Life.[1] Student Life contracted with Windermere to hold the church camp at Windermere's facility in Missouri. Student Life had a liability policy with Great American, and Windermere was an additional insured on that policy.

---

[1] Lifeway Christian Resources of the Southern Baptist Convention does business as Student Life. The Court refers to Lifeway and Student Life interchangeably throughout the remainder of this Order as simply, "Student Life."

The additional insured endorsement provides that the additional insured, in this case Windemere, is only covered for "liability arising out of the ownership, maintenance or use of that portion of the premises leased to [Student Life] [by Windemere]." [Doc. 35-17, p.1 ("Endorsement")]. Great American contends that Windemere is not entitled to coverage for Kaylee Richards's injuries because Windemere did not "lease" the Edge to Student Life because the Edge was not specifically mentioned in Student Life's written agreement with Windemere.

Pending before the Court is Great American's Motion for Summary Judgment. [Doc. 34]. For the following reasons, the Motion is granted in part and denied in part.

## I. Undisputed Facts[2]

### A. The Student Life Camp at Windemere

Windemere Baptist Conference Center is a large Conference Center on the Lake of the Ozarks with over 300 acres and 126 buildings, including group lodging, a dining hall, conference space, cabins, a chapel, and a gift shop. Windemere also offers various recreational facilities and activities at its campus, including the Edge. Organizations like Student Life use Windemere's facilities for summer church camps.

Student Life had been conducting camps at Windemere for about ten years prior to its June 2014 camp. In January 2014, Student Life and Windemere executed an Amended Conference Contract. The "Amended Conference Contract," provides:

**Amended Conference Contract**

. . .
**EVENT INFORMATION**
Event Name:   Student Life #1 '14 (June 2-6, 2014)
Expected #:    1000
**Arrive Date:** Saturday, May 31, 2014

---

[2] Unless otherwise noted, the facts recited are those which are properly supported and undisputed.

2

(Check in begins at 3:00 PM. Rooms may not be available until 6:00 PM. . .)

**Depart Date:** Saturday, June 7, 2014

Lodging Check out time is 11:00 AM. Keys must be turned in by this time. . .)

## LODGING INFORMATION

| Lodging Type | Start | End | Nights | Units | Cost | Total |
|---|---|---|---|---|---|---|
| Per Person (Student Life Extra) | 5/31/14 | 6/2/14 | 2 | 25 | $17.50 | $825.00 |
| Per Person (Student Life Extra) | 6/1/14 | 6/2/14 | 1 | 15 | $17.50 | $262.50 |
| Per Person (Student Life '14) | 6/2/14 | 6/5/14 | 4 | 1,000 | $70.00 | $70,000 |
| | | | | | | Minimum |
| | **Total for Lodging: $71,137.50** | | | | | **$56,910.00** |

**You will need to provide Windermere a rooming list (names of individuals occupying each room) and a copy of your conference or retreat schedule at the time of check-in.**

. . .

## MEAL INFORMATION

. . .                                     Minimum

**Total for Meals: $76,570.00      $61,733.00**

. . .

All guests eating in the dining hall must have a meal ticket or wrist band to be admitted into the Dining Hall.

. . .

## CONFERENCE SPACE INFORMATION

| Facility/Room | Start | End | Cost |
|---|---|---|---|
| . . . | | | |
| Wilderness Creek Auditorium (1500) | 6/1/14 8:00am | 6/6/14 12:00pm | |
| . . . | | | |
| Deer Ridge Conf Rm 1 (30) | 6/2/14 3:00pm | 6/6/14 12:00pm | |
| . . . | | | |

**Total for Conference Space: $0.00**

Use of conference space and facilities begins at the start time stated in the contract. Conference or facility space usage time ends at the time stated in the contract and must be empty of all guests and guest items.

. . .

## ENTITY OBLIGATION

**Estimated Total Payment**    $147,707.50

**Total Minimum Payment**    $118,643.00

. . .

## Property Damage/Abuse

The above named group will have financial responsibility for any damages and excessive wear and tear it incurs to the Windermere grounds, facilities or property to the extent that such damage or excessive wear and tear arises from the negligence or willful misconduct of the above named group. Cleanup of any facilities or grounds that are excessively dirty will be the financial responsibility of the group.

[Doc. 35-5 ("Amended Conference Contract")].

The parties' Amended Conference Contract does not identify every building or activity that was available to campers during Student Life's camp at Windermere. For example, the chapel, which is made available to any group attending a camp at Windermere, is not listed. In addition, the dining hall is not specifically listed under the "Conference Space Information" heading, despite the Amended Conference Contract listing a price for meals Windermere is to provide.

In addition, it is undisputed that Windermere offered various free recreational activities to its guest campers, including those who attended the Student Life camp. Windermere also offered some special recreational activities that required an additional fee and reservations. The Edge was one such activity. The Edge, a ropes and zip-lining course, is not accessible to campers at Windermere without special scheduling, the purchase of tickets, and the execution of a "Recreational Release" form. Student Life advertised Windermere's recreational facilities, including "The Edge," as available for use to its campers, and it was Student Life's expectation that these facilities would be available.

In addition to the Amended Conference Contract, Student Life also completed a Facilities Request Form, and Windermere completed a Fax Back Response Sheet. [Docs. 40-3 and 40-4]. The Fax Back Response Sheet provides:

**Student Life Camp**
**Windermere Conference Center**
**Recreation:**
. . .
What are some free-time options on your campus?
- Sand Volleyball, Outdoor Basketball, Tennis, Mini Golf, Disc Golf, Pool, Hiking, The Edge (low/high ropes course), Paintball, Waterfront Activities (Inflatable water park, kayak, canoe, paddle boats, fishing, etc) (See attached PDF on available Recreation Packages).

[Doc. 40-4, p. 3].

**B. Great American Insurance Policy**

Student Life is the named insured on a Commercial General Liability policy with Great American. The policy requires that all requests for medical payments be made within one year of the accident that gives rise to the insurance claim. [Doc. 42-2, p. 62 of 166]. Also, when there is other valid and collectible excess insurance coverage, the Great American policy provides that Great American will have no duty to defend its insured against a claim for damages. [Doc. 42-2, p. 67-68 of 166].

Because Student Life was contracting with Windermere for its event, Windermere was named as an additional insured on Student Life's Great American policy. The Certificate of Liability Insurance was issued by Great American on May 8, 2014, and Windermere accepted. The Certificate referenced Great American's policy issued to Student Life, Policy No.: GLP 0310189 and stated:

> Event: Student Life     Event Dates: May 31-June 7 and June 14-20, 2014
> Windermere Conference Center is included as Additional Insured on the General
> Liability policy, as per endorsement #CG 82 24, ed. 12/01, and on the Automobile
> Liability policy, as per endorsement #CA 8518, ed. 6/09.

[Doc. 35-7 ("Certificate of Liability Insurance")].

**C. The Underlying Lawsuit**

The Searcy Baptist Church youth group was one of the groups of campers that attended Student Life's camp at Windermere in June of 2014. Karlee Richards and the rest of the Searcy youth group were scheduled to ride The Edge on June 4, 2014. They paid Windermere an additional fee for this activity. While zip-lining at The Edge that day, Richards fell and was

injured.  Kendra Brown, a Windermere employee, was working at the Edge at the time of the accident.

Following Karlee Richards's accident at The Edge, her father, Jeremy Richards, both individually and as Next Friend, brought suit against Windermere and several of Windermere's employees, including Kendra Brown.  This lawsuit is currently pending in the Circuit Court of Morgan County, Missouri and seeks damages for Karlee Richards's physical injuries sustained at The Edge.

On November 17, 2015, Windermere and Kendra Brown tendered claims to Great American for defense and indemnity of the underlying lawsuit, seeking coverage as additional insureds under Student Life's Great American policy.  [Doc. 35-15 ("Demand Letter")].  The letter also demanded Medical Payments coverage for Karlee Richards's medical expenses.  The demand for Medical Payments coverage was made more than one year after Richards's June 4, 2014 accident at The Edge.  [Docs. 35-15 ("Demand Letter") and 35-18 ("Feb. 4, 2016 Denial Letter")].

 Great American responded to the parties' demand letter with a request for additional information, including information regarding Windermere's coverage through Church Mutual Insurance Company.  Windermere's insurer, Church Mutual, was defending Windermere in the underlying lawsuit.  [Doc. 35-14, p. 1 of 7 ("Dec. 17, 2015 Letter")].  In subsequent correspondence with Great American, Windermere also stated, "Church Mutual, the insurer for 'Windermere' has tendered its full two million dollars in liability insurance."  [Doc. 35-14, p. 1 of 7 ("Dec. 17, 2015 Letter")].

In its February 4, 2016 denial letter to Windermere and Brown, Great American concluded that Richards's accident did not arise out of the ownership, maintenance, or use of the

premises Windermere leased to Student Life and denied Windermere's tender. Great American's letter also provided that:

> [E]ven if indemnity coverage did exist for Windermere and Kendra Brown under the Lifeway Policy, it is also clear that that [sic] Great American owes no defense obligation of the pending lawsuit. Your December 17, 2015 correspondence renewing the tender of defense on behalf of both Windermere and Kendra Brown makes clear that Windermere is being afforded a defense by Church Mutual and that Kendra Brown is being defended by both Church Mutual and Shelter. . . . [T]he Social Service Agency General Liability Broadening Endorsement makes clear that any coverage that did exist would be excess over all other insurance, including both the Church Mutual and Shelter policies. The "Other Insurance" provision of the Lifeway Policy makes clear that, where its coverage is excess and a defense is being provided by another carrier, Great American owes no duty to defend. Hence, Windermere's and Kendra Brown's tender of the defense of the pending lawsuit is denied for this additional reason.

[Doc. 35-18, p. 6 ("Feb. 4, 2016 Denial Letter")]. Great American also denied Brown's tender, stating that she was not an additional insured on the policy. *Id.*

## II.    Discussion

Windermere seeks coverage in the underlying Morgan County lawsuit as an additional insured under the Great American policy issued to Student Life. After denying Windermere's tender, Great American filed suit before this Court seeking a declaratory judgment regarding its obligations under the policy. Great American now moves for summary judgment on its requested declaratory judgment that: (1) no liability coverage exists under its policy issued to Student Life for any claims asserted in the underlying lawsuit against Windermere or Windermere's employees, including Kendra Brown; (2) Great American owes no duty to defend Windermere, Kendra Brown, or any other Windermere employees in the underlying lawsuit; and (3) no medical payments coverage exists for Karlee Richards.

A movant is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The rule requires summary judgment to be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

A federal court sitting in diversity applies the choice-of-law rules of the state where the court sits, in this case, Missouri. *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *American Guarantee Liability Ins. Co. v. U.S. Fidelity & Guaranty Co.,* 668 F.3d 991, 996 (8th Cir.2012). But a court need not undertake a choice-of-law inquiry unless an actual conflict of law is demonstrated. *Prudential Ins. Co. of Am. v. Kamrath,* 475 F.3d 920, 924 (8th Cir.2007) (citation omitted). Because the parties do not raise any actual conflict and because they do not dispute that Missouri law applies, the Court applies Missouri law.[3]

### A. Interpretation of Insurance Policies in Missouri

The interpretation of an insurance policy is a question of law to be determined by the Court. *Mendota Ins. Co. v. Lawson,* 456 S.W.3d 898, 903 (Mo. Ct. App. 2015). The ultimate goal of contract interpretation is to determine the intent of the parties. *Bolinger v. Clarks Mut. Ins. Co.*, 485 S.W.3d 803, 809 (Mo. Ct. App. 2016). To determine the intent of the parties, the language in the contract is to be read according to its plain and ordinary meaning. *Mendota*, 456 S.W.3d at 903.

---

[3] Plaintiff Great American contends no choice of law analysis is necessary because the outcome is the same under the law of the three states that could potentially apply: Missouri, Tennessee, and Alabama. Because Defendants Windermere, Brown, and the Richards contend Missouri law should apply, the Court concludes that the parties agree to the application of Missouri law.

In interpreting an insurance policy, "[t]he key is whether the contract language is ambiguous or unambiguous." *Todd v. Mo. United Sch. Ins. Council*, 223 S.W.3d 156, 160 (Mo. banc 2007). If an ambiguity exists, the policy language will be construed against the insurer. *Mendota*, 456 S.W.3d at 904. "'An ambiguity exists when there is duplicity, indistinctness, or uncertainty in the meaning of the language of the policy.'" *Fanning v. Progressive Northwestern Ins. Co.,* 412 S.W.3d 360, 364 (Mo. Ct. App. 2013) (quoting *Seeck v. Geico Gen. Ins. Co.,* 212 S.W.3d 129, 132 (Mo. banc 2007)). "'To test whether the language used in the policy is ambiguous, the language is considered in the light in which it would normally be understood by the lay person who bought and paid for the policy.'" *Blumer v. Automobile Club Inter–Ins,* 340 S.W.3d 214, 219 (Mo. Ct. App. 2011) (quoting *Heringer v. Am. Family Mut. Ins. Co.,* 140 S.W.3d 100, 102 (Mo. Ct. App. 2004)). "Whether an insurance policy is ambiguous is a question of law." *Todd*, 223 S.W.3d at 160.

"[T]he parties seeking to establish coverage under the insurance policy have the burden of proving that the claim is within the coverage afforded by the policy . . . even though they are denominated as defendants in a declaratory judgment action." *State Farm Fire & Cas. Co. v. D.T.S.*, 867 S.W.2d 642 (Mo. Ct. App. 1993).

**B.  Liability Coverage for Windermere as Additional Insured**

The Great American policy's declarations page lists Student Life as the named insured. Windermere is listed as an additional Insured as follows:

> **5. AUTOMATIC ADDITIONAL INSURED(S)**
> **a.  Additional Insured – Manager or Lessor of Premises**
> **(1)** This policy is amended to include as an insured any person or organization (hereinafter called Additional Insured) from whom you lease or rent property and which requires you to add such person or organization as an Additional Insured
> \*\*\*

> **(2)** With respect to the insurance afforded the Additional Insured identified in **Paragraph A.(1)** of this endorsement, the following additional provisions apply:
>
> > **(a)** This insurance applies only to liability arising out of the ownership, maintenance or use of that portion of the premises leased to [Student Life].

[Doc. 35-17, p. 1 ("Endorsement")]

Great American contends that the reference in Section 5.a.(2)(a) to "premises leased to you" refers to the specific places identified in the Amended Conference Contract between Windermere and Student Life. According to Great American, because the Edge is not listed, Windermere's potential liability for the accident at the Edge is not covered. In contrast, Windermere argues that "premises lease" includes all the places on its property that Student Life campers were authorized to access, including the Edge.

### 1. Interpretation of Section 5.a.(2)(a)[4]

Whether an insurance provision is ambiguous is a question of law for the Court. *General Am. Life Ins. Co. v. Barrett*, 847 S.W.2d 125, 131 (Mo. Ct. App. 1993). A policy is ambiguous if

---

[4] Defendants Brown and the Richards argue that the limitation of liability in Section 5.a.(2)(a) does not apply to Windermere because that section refers to Paragraph A.(1), and Windermere is identified as an Additional Insured by Paragraph a.(1). In other words, these Defendants reason that the parties must be referring to something other than the preceding paragraph a.(1) because capital A.(1) rather than lower case a.(1) was used. Defendants further reason that the only "Paragraph A.(1)" in the endorsement is located in Section 7A.(1) which limits liability to $300,000 for personal property and building damage rented to an additional insured. The Court rejects this argument because the reference to "A" instead of "a" is clearly a minor typographical error, and the Defendants' strained interpretation of Section 7 in this context makes no sense. In *Mendota Insurance Company v. Ware*, 348 S.W.3d 68 (Mo. Ct. App. 2011), the Missouri Court of Appeals rejected a similar argument based on a typographical error because the "policy's intended meaning, would be apparent to an ordinary reader." *Id.* at 73. In the context of the Great American policy, it would not be reasonable for an ordinary reader to think that the use of A.(1), immediately after a section labeled a.(1), would be referring to 7A.(1) when 7A.(1) has nothing to do with identifying an additional insured and is not located in close proximity to the paragraph that does deal with the additional insured.

it is "fairly open to different interpretations" because it contains "duplicity, indistinctness, or uncertainty of meaning." *Id.* Importantly, there are two types of ambiguities in the law: patent and latent. *Cent. United Life Ins. Co. v. Huff*, 358 S.W.3d 88, 95 (Mo. Ct. App. 2011). "A patent ambiguity is detected from the face of the document, whereas a latent ambiguity is found 'when the particular words of a document apply equally well to two different objects or some external circumstances make their meaning uncertain.'" *Id.* (quoting *Jake C. Byers, Inc. v. J.B.C. Invs.*, 834 S.W.2d 806, 816 (Mo. Ct. App. 1992)).

### a. Patent Ambiguity

The key phrase that this Court must interpret and apply is "portion of the premises leased to [Student Life]." "The words of a policy must be given their plain and ordinary meaning consistent with the reasonable expectation and objectives of the parties, unless it is obvious that a technical meaning was intended." *Bolinger v. Clarks Mut. Ins. Co.*, 485 S.W.3d 803, 809 (Mo. Ct. App. 2016). (internal quotation marks removed). Counsel for Great American argues that the term "lease" is understood by everyone to be a premise over which one has exclusive or near exclusive control. [Oral Argument Transcript, p. 3]. Therefore, the word "lease" would only cover the property over which Student Life had exclusive control by the terms of the Amended Conference Contract. In contrast, Windermere effectively argues that all of the documents surrounding the formation of the insurance policy demonstrate that an ordinary person would not intend the technical meaning of the term "lease," i.e. exclusive possession, but instead, would expect it to cover all of the Windermere property to which Student Life campers had authorized access.

Under Missouri law, a lease gives exclusive[5] use of property for a determined period of time to the lessee. *Chubb Group of Ins. Cos. v. C.F. Murphy & Associates, Inc.*, 656 S.W.2d 766, 777 (Mo. Ct. App. 1983). The term "lease" gives rise to a landlord-tenant relationship, whereby the tenant has "exclusive possession of the premises as against all the world," including the landlord. *Santa Fe Trail Neighborhood Redevelopment Corp. v. W.F. Coehn & Co.*, 154 S.W.3d 432, 439 (Mo. Ct. App. 2005) (internal quotation marks and citations removed). In contrast, "[a] license is only a privilege to enter certain premises for a specific purpose. *Kimack v. Adams*, 930 S.W.2d 505, 507 (Mo. Ct. App. 1996). The difference between a lease and a license is technical and difficult to determine. *Santa Fe*, 154 S.W.3d at 439.

When there is a conflict between the technical definition of a term in a policy and what a reasonable person would understand, the lay definition controls unless it is obvious that a technical definition was intended. *Mansion Hills Condo. Ass'n v. Am. Fam. Mut. Ins. Co.*, 62 S.W.3d 633, 638 (Mo. Ct. App. 2001). "To determine the [lay definition] of a term, courts will consult standard English language dictionaries." *Id.* Merriam Webster's New College Dictionary defines "leased" as "property occupied or used under the terms of a lease." Webster's II New College Dictionary (1995). "Lease" is defined as "a contract granting occupation or use of property during a certain period in exchange for a specified rent." *Id.* "Premises" is defined as "land and the buildings on it." *Id.* Those definitions do not indicate possession is exclusive.

In this context, did the parties intend the phrase "premises leased to you" to have a technical meaning—i.e. the formation of a landlord-tenant relationship between Windermere and Student Life whereby Student Life would have exclusive control over the property listed in the

---

[5] Great American did not cite to a case that says "near exclusive" possession is enough, and the Court has found no such statement in Missouri law.

Amended Conference Contract, even as to Windermere?  The Certificate of Insurance [6] suggests otherwise.  [Doc. 35-7].  It states:

> Event: Student Life     Event Dates: May 31-June 7 and June 14-20, 2014
> Windermere Conference Center is included as Additional Insured on the General Liability policy, as per endorsement #CG 82 24, ed. 12/01, and on the Automobile Liability policy, as per endorsement #CA 8518, ed. 6/09.

This language does not suggest that the parties intended a landlord-tenant relationship being created between Student Life and Windermere.  Rather, it suggests that Great American knew it was providing liability insurance to Windermere for an event – the camp – being held by Student Life on the Windermere campus. At a minimum, there is a conflict between the technical meaning of the word lease and what an ordinary person would understand under these circumstances, taking into account the dictionary definitions.  In those circumstances, the technical definition does not control.  *See Mansion Hills Condo. Ass'n v. Am. Fam. Mut. Ins. Co.*, 62 S.W.3d 633, 638 (Mo. Ct. App. 2001).

Further, *State ex rel. State Highway Commission v. Johnson*, 592 S.W.2d 854, 857-8 (Mo. Ct. App. 1979), says that a court may consider the circumstances under which the contract was made.  These circumstances, as discussed below in the section on latent ambiguity, also support a finding that an ordinary person would expect to be covered for camp activities, not just for dorm rooms and conference space.

_____

[6] Because the Certificate of Liability was issued to Windermere for the purpose of adding Windermere as an additional insured, "as per endorsement #CG 82 24 ed. 12/01," the Certificate arguably became a part of the insurance contract.  *See Corder v. Morgan Roofing Co.*, 295 S.W.2d 441 (Mo. 1946) (finding certificate of insurance that doubled liability coverage, added insurance for property damage, and certified complete coverage of all operations in connection with the insured's construction contract was part of the insurance contract); *see also*, Section 1.5.a.(1) of this endorsement:

> This policy is amended to include as an insured any person or organization (hereinafter called Additional Insured) from whom you lease or rent property and which requires you to add such person or organization as an Additional Insured on this policy.

For these reasons, a patent ambiguity exists. The disputed phrase not only should be interpreted in favor of the Defendants, but the Defendants' interpretation is arguably the only one that would make sense to an ordinary person under these circumstances.

### b. Latent Ambiguity

Even if there were no patent ambiguity, the Court can look at extrinsic evidence to determine if there is a latent ambiguity.[7] *Royal Banks of Mo. v. Fridkin*, 819 S.W.2d 359, 362 (Mo. banc 1991) ("A latent ambiguity . . . must be developed by extrinsic evidence.").

A latent ambiguity exists when a contract "on its face appears clear and unambiguous, but some collateral matter makes the meaning uncertain." *Id.* In other words, an ambiguity is "latent if language, which is plain on its face, becomes uncertain upon application." *Gen. Am. Life Ins. Co. v. Barrett*, 847 S.W.2d 125, 131 (Mo. Ct. App. 1993). For example, "[a] latent ambiguity may be one in which the description of the property is clear upon the face of the instrument, but it turns out that there is more than one estate to which the description applies; or it may be one where the property is imperfectly or in some respects erroneously described, so as not to refer with precision to any particular object." *Muilenburg, Inc. v. Cherokee Rose Design & Build, LLC*, 250 S.W.3d 848, 854-55 (Mo. Ct. App. 2008) (quoting *Prestigiacamo v. Am. Equitable Assur. Co. of N.Y.*, 221 S.W.2d 217, 221 (1949) (internal quotation marks omitted)). The case of *Royal Banks of Mo. v. Fridkin*, 819 S.W.2d 359, 362 (Mo. banc 1991) provides another example. In *Royal Banks*, the Missouri Supreme Court found a latent ambiguity in an otherwise unambiguous contract where the contract described a $10,000.00 promissory note but where no $10,000.00 promissory note actually existed. *Id.* Looking to extrinsic evidence, the

---

[7] Although Defendants do not use the term latent ambiguity, this appears to be the crux of Defendants' argument: that even if the "premises leased" term is not ambiguous on its face, it is ambiguous when applied to the facts at hand.

court concluded, "Evidence of a promissory note that fits the description in the guaranty in all respects except for principal amount, coupled with the fact that a $10,000.00 note did not exist, is a collateral matter that renders the meaning of the guaranty uncertain. Once it became apparent that there was no $10,000.00 note but instead only a $50,000.00 note, a latent ambiguity existed." *Id.*

Although parol evidence may not ordinarily be considered to create an ambiguity, the Court may consider such evidence to demonstrate the existence of collateral matters that create a latent ambiguity. *Royal Banks of Mo. v. Fridkin*, 819 S.W.2d 359, 362 (Mo. banc. 1991) ("A latent ambiguity is not apparent on the face of the writing and therefore, must be developed by extrinsic evidence."). Therefore, the Court may consider extrinsic evidence to determine if a latent ambiguity exists. In this case, in the absence of a definition of "premises leased," the surrounding facts suggest a latent ambiguity about what was intended by this term.

The plain language of the Amended Conference Contract alludes to Student Life's use of and access to many more properties than merely conference space and lodging units during its event. For example, the Contract's plain language contemplates Student Life's use of a dining hall[8] because the meals they contracted for were to be served there. Yet, the Contract does not specifically list the dining hall. Likewise, the Contract does not mention the chapel, despite Windermere's title as Windermere *Baptist* Conference Center and its practice of contracting with church groups to conduct summer church camps. At a minimum, a jury could find the parties intended that campers would have access to the chapel, even though it was not listed. Finally,

---

[8] The Contract's "Meal Information" section provides start and end times for specific meals and alludes to Student Life's use of the Dining Hall, stating, "All guests eating in the dining hall must have a meal ticket or wrist band to be admitted into the Dining Hall." [Doc. 35-5, p. 2].

the Contract, like the Certificate of Insurance, refers to an "Event," and Great American's interpretation of the Contract considers only part of what was going to occur at that event.

The Court also considers the parties' Fax Back Response Sheet. [Doc. 40-4]. This document confirms that the purpose of the parties' agreement was to host an event, referred to by the Sheet as "Student Life Camp." [Doc. 40-4]. In addition, the Sheet shows the parties' understanding that Student Life's campers would have access to not only conference and dorm space, but also a church for worship, recreational fields, a gymnasium, hiking trails, a body of water for "waterfront activities," and as is relevant in this case, The Edge ropes course:

> What are some free-time options on your campus?
> - Sand Volleyball, Outdoor Basketball, Tennis, Mini Golf, Disc Golf, Pool, Hiking, *The Edge (low/high ropes course)*, Paintball, Waterfront Activities (Inflatable water park, kayak, canoe, paddle boats, fishing, etc) . . .

*See generally* [Doc. 40-4 and p. 3 (emphasis added)]. Because Student Life was contracting with Windermere for an event—to host a camp complete with various camp activities and facilities— the Court cannot find that a reasonable insured would have intended the term, "premises leased," to limit its coverage only to liability arising out of conference rooms and lodging units.

There is no dispute that Student Life camper, Karlee Richards, was authorized to access The Edge at the time of her accident. Based on the Fax Back Response Sheet, alone, which suggests that Student Life would expect to have access to The Edge during its event, a reasonable juror could conclude that The Edge was a "portion of the premises leased," which would entitle Windermere to coverage as an additional insured for its liability to Richards. Therefore, summary judgment must be denied.[9]

_____

[9] Although Defendants did not file their own motions for summary judgment, Defendants ask the Court to grant summary judgment in their favor, citing Fed. R. Civ. P. 56(f)(1), which provides: "After giving notice and a reasonable time to respond, the court may: (1) grant summary judgment for a nonmovant." [Doc. 53]. Granting summary judgment for the non-movants under

In the alternative, it is well-settled that an ambiguity within an insurance policy must be construed against the insurer. *Krombach v. Mayflower Ins. Co., Ltd.*, 827 S.W.2d 208, 210 (Mo. banc 1992). As already discussed, an ambiguity exists as to what the parties intended "premises leased" to refer to. Therefore, construing this ambiguous term against Great American requires the Court to apply the meaning "which would be attached by an ordinary person of average understanding if purchasing insurance." *Id.* An ordinary insured could reasonably understand this phrase to refer to the areas to which Student Life had access during its event at Windermere. Therefore, Great American's Motion for Summary Judgement must be denied on this issue.

Great American's cited authorities do not require a different outcome. First, the coverage disputes in many of Great American's authorities center on how to interpret "arising out of," without any dispute as to what properties the parties understood to be the "leased premises" covered by the additional insured endorsement at issue. In contrast to the facts before this Court, each of these cases involved an undisputed lease contract between a landlord and tenant, rather than an event contract between two organizations, and there was no dispute or ambiguity surrounding what property was meant by the "premises leased" or a similar term. *See, e.g., Belz Park Place v. P.F. Chang's China Bistro, Inc.*, 2015 WL 11145058 (W.D. Tenn. Mar. 23, 2015) (within context of landlord-tenant relationship, involving a lease contract, and no dispute about the leased premises); *Liberty Mut. Ins. Co. v. Michigan Mut. Ins. Co.*, 891 N.E.2d 99 (Ind. Ct. App. 2008) (same); *Northbrook Ins. Co. v. American States Ins. Co.*, 495 N.W.2d 450 (Minn. Ct. App. 1993) (same); *Hilton Hotels Corp v. Employers Ins. of Wausau*, 629 So.2d 1064 (Fla. Dist.

---

this rule is discretionary. Due to the fact that the focus of this briefing has been on Great American's request for summary judgment, the Court declines to exercise its discretion under this provision. However, the Court will permit Defendants to file their own motions for summary judgment within 20 days of the date of this Order, not inconsistent with this order as to the issues ruled against them.

Ct. App. 1994) (same); *SFH, Inc. v. Millard Refrigerated Svcs., Inc.*, 339 F.3d 738 (8th Cir. 2003) (same).

For example, in *U.S. Fidelity & Guar. v. Drazic*, 877 S.W.2d 140 (Mo. Ct. App. 1994). the Missouri Court of Appeals considered additional insured coverage within the context of a landlord-tenant relationship and an unambiguous lease contract.  The Drazics leased a portion of their basement to the Brewers, and the Drazics were named as additional insureds under the Brewers' liability insurance policy.  *Id.* at 141.  After the Brewers' employee fell in a parking lot near the Drazics' building and injured herself, she filed suit alleging that the Drazics negligently discharged steam from their dry cleaning business, which formed ice on the parking area causing her fall.  *Id.* at 141-42.  The policy's additional insured endorsement provided coverage to the Drazics as additional insureds "but only with respect to liability arising out of the ownership, maintenance or use of that part of the premises *designated below leased to the named insured*."  *Id.* at 142-43 (emphasis added).  The court considered the parties' lease contract, which identified the premises leased as a "designated portion of a commercial building known and numbered as 418 Manchester Road, Ballwin, Missouri 63011, plus the area adjacent to the entrance of Brewer's Quilt Shop for installation of their office."  *Id.* at 142.  The court reasoned that the endorsement's "plain language contemplated coverage for the Drazics as additional insureds for liability arising out of incidents taking place in that part of the building leased to the Brewers pursuant to the lease contract" and that there was no coverage  because the accident at issue "took place on a parking area outside the building."  *Id.* at 143.

In contrast to *Drazic*, the Great American policy does not limit coverage to the "premises designated below" accompanied by a lease that specifically identifies an address or description

of the area unambiguously covered by this clause. Also unlike the facts before this Court, there is no dispute or uncertainty in *Drazic* about what is meant by the "premises [leased]."

In addition, the Court rejects Great American's reliance on *Drazic* for the separate proposition that "the purpose of additional insured endorsements obtained in a landlord-tenant context is to provide landlords protection from vicarious liability due to a *tenant*'s action which takes place on the premises that the tenant has leased." [Doc. 35, p. 16 (quoting *Drazic*, 877 S.W.2d at 143)]. Despite articulating this theory, the *Drazic* court did not resolve the coverage question based on vicarious liability: "The injury to Leary occurred due to alleged negligence on the part of the landlords' business . . . *and it did not occur on the premises leased to the [tenants]*." *Drazic*, 877 S.W.2d at 143 (emphasis added). Furthermore, to the extent Great American contends that additional insured coverage is limited to acts for which Windermere is vicariously liable, the Court disagrees. The case from which this theory originated involved an insurance contract materially different from the one at issue here because the policy language in that case specifically limited coverage for additional insureds "against *vicarious liability* for the acts of the named insured." *See Hormel Foods Corp. v. Northbrook Property and Cas. Ins. Co.*, 938 F. Supp. 555, 558-560 (D. Minn. 1996) (quoting *Harbor Ins. Co. v. Lewis*, 562 F. Supp. 800, 802 (E.D. Pa. 1983) and explaining the origins and inapplicability of this theory). In contrast, coverage under the Great American policy cannot be said to turn on "vicarious liability" because the policy provision does not use this language.

As for other cases cited by Great American, these cases are distinguishable because they involve starkly different contract language than the term, "premises leased," which this Court has found to be ambiguous. *See, e.g., Lancaster v. Ferrell Paving, Inc.*, 397 S.W.3d 606 (Tenn. Ct. App. 2012) (involving different endorsement language: "liability arising out of your *ongoing*

*operations performed for* the [additional] insured") (emphasis added). Finally, Great American's reliance on contract cases outside of the insurance context is misplaced because these cases also interpret contract provisions that are unlike the policy language at issue here. *See, e.g., Once Upon a Time, LLC v. Chappelle Properties, LLC*, 2016 WL 3031347 (Ala. May 27, 2016) (applying Alabama law to an indemnity agreement that did not contain the language "arising out of" or "premises leased" and did not involve insurance policy); *Union Realty Co., Ltd. v. Family Dollar Stores of Tennessee, Inc.*, 255 S.W.3d 586 (Tenn. Ct. App. 2008) (interpreting contract language regarding the landlord's and tenant's obligations to procure insurance but no interpretation of insurance policy language at issue); *Pilla v. Tom-Boy, Inc.*, 756 S.W.2d 638 (Mo. Ct. App. 1988) (interpreting indemnity provision in a lease that did not contain the language "arising out of" outside of insurance context and no dispute surrounding what constituted the leased premises).

Finally, the Court rejects Great American's separate argument that whether a tenant has "shared" versus "exclusive" use of an area controls whether that area is part of the "premises leased" covered by an insurance endorsement. For example, in *Colony Ins. Co. v. Pinewoods Enterprises, Inc.*, 29 F. Supp. 2d 1079 (E.D. Mo. 1998), a district court found insurance coverage for liability arising out of an area shared between the additional insured and other parties. In *Colony*, Bledsoe and Pinewoods entered a leasing contract in which Bledsoe (the lessee) leased portions of Pinewood's campgrounds for a concert. *Id.* at 1081. Pinewoods was named as an additional insured under Bledsoe's general liability policy with Colony Insurance. *Id.* During the concert, a rain storm caused many of the concert goers to take shelter on and under a deck attached to a lodge at the campground. *Id.* The lodge's deck collapsed, injuring numerous

20

concertgoers. *Id.* At issue was whether Colony Insurance's coverage of Pinewoods as an additional insured extended to this accident. *Id.*

The court considered both the insurance policy endorsement and the parties' lease contract. The endorsement provided additional insured coverage "but *only with respect to liability arising out of your [Bledsoe's] operations or premises owned by or rented to you.*" *Id.* at 1082. The leasing contract specifically provided that Bledsoe "shall have the exclusive use of the Pinewoods Park" for a specific time period with the exception of the Lodge area. *Id.* at 1081-82. The contract also provided:

> (5) LESSEE [Bledsoe], its customers, guests and invitees will share the Lodge area and facilities, i.e. store, gift shop, bait and tackle area . . . with the fishermen and permanent guests and any campers reserved prior to June 10, 1995.

*Id.* at 1082. The court concluded that Bledsoe leased the lodge area because the contract "specifically (*albeit not exclusively*) lease[d] the lodge area to Bledsoe," and the endorsement provided that coverage extended to "the premises owned by or rented to you." *Id.* at 1083 (emphasis added). The court concluded that "Colony's additional insured endorsement extend[ed] coverage to Pinewoods for any liability arising out of the collapse of the lodge's deck because the lodge was part of the premises leased to Bledsoe." *Id.* In contrast to Great American's contention that exclusivity is required, the *Colony* court still found the lodge premises to be "rented to" Bledsoe for purposes of additional insured coverage, despite the fact that the parties' lease agreement provided that Bledsoe would "*share*" the lodge area premises at issue "with the fishermen and permanent guests and any campers." *Id.* (emphasis added).

### C. Liability Coverage for Kendra Brown or Other Windermere Employees

Great American also moves for summary judgment on the issue of coverage for Kendra Brown, Windermere's employee. Great American argues that no coverage exists for Brown or

any other Windermere employee because the Additional Insured Endorsement does not provide additional insured status and/or coverage for an additional insured's employees. Brown is not identified anywhere in Student Life's Great American policy nor is she listed as an Additional Insured on a Certificate of Liability. Therefore, any coverage for Brown would necessarily derive from her status as Windermere's employee, and employees are not covered as insureds by the Additional Insured Endorsement.

Brown does not dispute that the Additional Insured Endorsement fails to provide coverage for an additional insured's employees. Instead, Brown argues that Windermere should be considered a "Named Insured," which in turn, makes the provisions applicable to "Named Insureds" also applicable to Windermere, including the provision that expands coverage for "Named Insureds" to their employees. The Court rejects this argument as based on an unreasonable interpretation of the policy.

Brown contends that the policy does not define "Named Insured," and thus, it must be given the meaning that would be attached by an ordinary person. Brown reasons that an ordinary person would define "Named Insured" as a person or entity that is actually named as an insured. In turn, Brown says, because the Certificate of Liability names Windermere as an additional insured, Windermere must be a "Named Insured." Brown next points to the following provision:

> Throughout this Policy the words "you" and "your" refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a named insured under this Policy.
>
> The word "insured" means any person or organization qualifying as such under **SECTION II – WHO IS AN INSURED**.
> ***

[Doc. 42-2, p. 65 of 166 ("CGL Policy")].  Brown contends that because she has established that Windermere is a "Named Insured," "you" and "your" throughout the policy must also refer to Windermere.  Next, Brown points to Section II of the policy:

**SECTION II – WHO IS AN INSURED**
2. Each of the following is also an Insured:
    a. Your . . . "employees," . . . but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business.

[Doc. 42-2, p. 65 of 166 ("CGL Policy")].  Brown argues that if the Court accepts her contention as true that Windermere is a "Named Insured," then "your" refers to Windermere, which means that Brown "is also an Insured" as "[y]our [Windermere's] 'employee,'" according to Section II.2.a.

Brown's argument fails because it is based on an unreasonable interpretation that Windermere is somehow a "Named Insured," a status unsupported by the policy's clear language.[10]  First, the policy distinguishes between mere "insureds" and those insureds that are "Named Insureds."  *Compare* "The word 'insured' means any person or organization qualifying as such under **SECTION II – WHO IS AN INSURED**" *with* "Throughout this Policy the words 'you' and 'your' refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a named insured under this Policy."  [Doc. 42-2, p. 65 of 166 ("CGL Policy")].  The fact that the policy differentiates between the two statuses shows that they are different terms, despite Brown's contention that all insureds named are "Named Insureds."

---

[10] Furthermore, even if the Court accepted Brown's contention that Windermere, an Additional Insured, was in fact, a Named Insured, Brown still has not shown that she is entitled to coverage under the policy as a Windermere employee because she has not alleged any facts or argument that her liability to Richards arose from "acts within the scope of [her] employment . . . or while performing duties related to the conduct of [Windermere's] business."  Section II.(2).a.; [Doc. 42-2, p. 65 of 166 ("CGL Policy")].

Furthermore, the policy's plain language identifies which insureds are "Named Insureds." First, the top of the policy's Declarations page states:

**NAMED INSURED**  LIFEWAY CHRISTIAN RESOURCES OF THE
SOUTHERN BAPTIST CONVENTION

[Doc. 42-2, p. 29 of 166]. Therefore, because Student Life is "shown in the Declarations," it is a "Named Insured." The policy also includes a Named Insured Endorsement, which amends the Declarations by providing, "It is agreed that the Named Insured shown in the Declarations is amended to read as follows." [Doc. 42-2, p. 41 of 166]. This statement is followed by a list of various organizations' names related to Lifeway, which the endorsement provides are also included as Named Insureds. *Id.* Accordingly, it is reasonable to conclude that these organizations constitute "any other . . . organization qualifying as a named insured under this Policy" and therefore are also "Named Insureds." [Doc. 42-2, p. 65 of 166 ("CGL Policy")]. Based on the policy's plain language, an ordinary person would understand "Named Insured" to refer to those insureds identified on the Declarations Page next to "NAMED INSURED" and those insureds identified in the Named Insured Endorsement. To interpret the policy to mean that anyone named as an insured, including those named as Additional Insureds, were also entitled to the same expansive level of coverage as the "Named Insureds" would be unreasonable.

In contrast to those entities that are clearly designated as "Named Insureds," Windermere is not listed as a Named Insured on either the Declarations page or on the endorsement adding Named Insureds to the Declarations page. Instead, the policy's only reference to Windermere is located in the Certificate of Liability it was issued prior to Student Life's 2014 camp, which included it as an "Additional Insured," providing:

Windermere Conference Center is included as **Additional Insured** on the General
Liability policy, as per endorsement #CG 82 24, ed. 12/01, and on the Automobile
Liability policy, as per endorsement #CA 8518, ed. 6/09.

[Doc. 35-7 ("Certificate of Liability Insurance") (emphasis added)].   The Additional Insured

Endorsement provides that it "is added to SECTION II – WHO IS AN INSURED, 5.

AUTOMATIC ADDITIONAL INSURED(S)."  [Doc. 35-17, p.1 ("Endorsement").]  Had Great

American intended to make Windermere a "Named Insured," it could have identified it as a

"Named Insured" within the Certificate of Liability, or it could have provided that Windermere

be added to the Named Insured Endorsement, rather than merely "Section II – Who is an

Insured."  It did neither.  For these reasons, an ordinary person would understand Windermere to

be an "insured," not a "Named Insured," and thus, the words "you" and "your" throughout the

policy do not refer to Windermere.   Accordingly, the provision that expands coverage for

"Named Insureds" to cover their employees as insureds does not apply to Windermere.  Because

Brown is not an insured under the policy and therefore not entitled to coverage, summary

judgment is granted in favor of Great American on this point.

### D.  Duty to Defend

Great American also contends that it owes no duty to defend Windermere or Brown and

it should be granted summary judgment on this claim.  Under Missouri law, the duty to defend

"arises whenever there is a potential or possible liability to pay based on the facts at the outset of

the case and is not dependent on the probable liability to pay based on the facts ascertained

through trial."  *Columbia Cas. Co. v. HIAR Holding, L.L.C.*, 411 S.W.3d 258, 265 n.10 (Mo.

2013) (internal quotation marks removed).  Because the Court has already found that Brown and

other Windermere employees are not insureds under Great American's policy and thus, not entitled to coverage, it follows that Great American has no duty to defend Brown.[11]

As to whether Great American owes a duty to defend Windermere, the Endorsement makes clear that any coverage for Windermere as an additional insured would be excess, and the policy does not afford a defense when (1) its coverage is excess and (2) when the insured is being provided a defense by another carrier.[12] Under Missouri law, "'an insurer's duty to defend is purely contractual.'" *Markel Am. Ins. Co. v. Unnerstall*, 2009 WL 57451 at *4 (E.D. Mo. 2009) (quoting *Crown Ctr. Redevelopment Corp. v. Occidental Fire*, 716 S.W.2d 348 (Mo. Ct. App. 1986)). "If there is no contract to defend, there is no duty to defend." *Id.* In relevant part, the Endorsement provides:

---

[11] This rationale was also articulated in Great American's denial letter, which provided:
> First, as to Kendra Brown, she is not listed as an additional insured on the Certificate of Liability Insurance, nor is there any indication on the [Certificate] that additional insured status is to be afforded to employees of Windermere. Finally, there is nothing in the specific form referenced on the Certificate . . . nor anywhere else in the Lifeway Policy, that affords additional insured status to Kendra Brown or any other Windermere employee. . . . Kendra Brown is simply not an additional insured under the Lifeway Policy such that Great American is denying the tender made on behalf of Kendra Brown.

[Doc. 35-18, p. 5-6 of 12 ("Feb. 4, 2016 Denial Letter")].

[12] This rationale was also articulated in Great American's denial letter, which provided:
> [E]ven if indemnity coverage did exist for Windermere and Kendra Brown under the Lifeway Policy, it is also clear that that [sic] Great American owes no defense obligation of the pending lawsuit. Your December 17, 2015 correspondence renewing the tender of defense on behalf of both Windermere and Kendra Brown makes clear that Windermere is being afforded a defense by Church Mutual and that Kendra Brown is being defended by both Church Mutual and Shelter. . . . [T]he Social Service Agency General Liability Broadening Endorsement makes clear that any coverage that did exist would be excess over all other insurance, including both the Church Mutual and Shelter policies. The "Other Insurance" provision of the Lifeway Policy makes clear that, where its coverage is excess and a defense is being provided by another carrier, Great American owes no duty to defend. Hence, Windermere's and Kendra Brown's tender of the defense of the pending lawsuit is denied for this additional reason.

[Doc. 35-18, p. 6 ("Feb. 4, 2016 Denial Letter")].

**5. AUTOMATIC ADDITIONAL INSURED(S)**
   **a. Additional Insured – Manager or Lessor of Premises**

      **\*\*\***

      **(2)** With respect to the insurance afforded the Additional Insured identified in **Paragraph A.(1)** of this endorsement, the following additional provisions apply:

         **\*\*\***

         **(d)** Coverage provided herein is excess over any other valid and collectible insurance available to the Additional Insured whether the other insurance is primary, excess, contingent or on any other basis unless a written contractual arrangement specifically requires this insurance to be primary.

The Additional Insured Endorsement's Section 5.a.(2)(d) is clear that any coverage afforded is "excess over any other valid and collectible insurance," regardless of the priority of coverage of the insurance—be it "primary, excess, [or] contingent." In this case, Church Mutual had already tendered, or attempted to tender its policy limits on Windermere's behalf in the underlying lawsuit. Therefore, although Windermere is entitled to coverage under the Great American policy, this coverage is excess.

The Other Insurance provision then states that where coverage is excess and the insured is being provided a defense by another carrier, Great American has no defense obligation. [Doc. 42-2, p. 66-68 of 166 ("CGL Policy")]. Specifically, this provision provides:

**SECTION IV – COMMERCIAL GENERAL LIABILITY CONDITIONS**

**\*\*\***

**4. Other Insurance**

    **\*\*\***

(2) When this insurance is excess we will have no duty under Coverages A or B to defend the Insured against any "suit" if any other insurer has a duty to defend the Insured against the "suit." . . .

Windermere is currently being defended by its own insurance carrier, Church Mutual. Because the policy is clear that there is no defense obligation where coverage is excess and a

defense is being provided by another carrier, which is the case here, the Court rejects Windermere's contention that it is entitled to a defense based on a potential for coverage. Therefore, summary judgment is granted for Great American on its duty to defend.

### E.  Medical Payments Coverage

Finally, Great American moves for summary judgment as to the Medical Payments coverage for Richards's medical expenses.  In its November 17, 2015 letter to Great American, Windermere demanded the Coverage C Medical Payments limits for Richards.  The provision governing Medical Payments provides in relevant part:

**COMMERCIAL GENERAL LIABILITY COVERAGE FORM**
\*\*\*
**Coverage C – Medical Payments**
**1.  Insuring Agreement**
**a.**  We will pay medical expenses as described below for "bodily injury" caused by an accident:
    \*\*\*
   provided that:
    \*\*\*
      **(b)**  the expenses are incurred and reported to us within one year of the date of the accident; and
    \*\*\*

[Doc. 42-2, p. 62 of 166 ("CGL Policy")].

Great American argues that it is entitled to summary judgment as to this coverage because medical expenses were not reported to Great American within the time limit provided in Paragraph 1.a.(b).  This provision provides that Great American will pay medical expenses for bodily injury "provided that . . . (b) the expenses are incurred and reported to us *within one year of the date of the accident*." Section 1.a.(b) (emphasis added).

Richards's accident occurred on June 4, 2014.  Neither she nor anyone on her behalf made claim for Medical Payments coverage until Windermere's November 17, 2015 demand

letter more than one year after the date of the accident. Therefore, Great American is entitled to summary judgment as to the Medical Payments coverage.

### III.     Conclusion

For the reasons set forth above, Plaintiff Great American Alliance Insurance Company's motion for summary judgment is granted in part and denied in part. [Doc. 34]. Summary judgment is granted on Great American's liability coverage for Kendra Brown, individually, as an additional insured; Great American's duty to defend Kendra Brown and Windermere; and Great American's Medical Payments coverage for Karlee Richards's injuries. Summary judgment is denied on Great American's coverage for Windermere as an additional insured. It is further ordered that on or before July 25, 2017, Defendants may file any motions for summary judgment not inconsistent with this order as to the issues ruled against them.


/s/ Nanette K. Laughrey
NANETTE K. LAUGHREY
United States District Judge

Dated:  July 5, 2017
Jefferson City, Missouri