UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

| | |
|---|---|
| GREAT AMERICAN ALLIANCE INSURANCE COMPANY, | ) ) ) |
| Plaintiff, | ) ) |
| vs. | ) No. 2:16-cv-04046-NKL ) ) |
| WINDERMERE BAPTIST CONFERENCE CENTER, INC., et al., | ) ) ) ) |
| Defendants. | ) |

**ORDER**

In June 2014, Karlee Richards and her Searcy Baptist Church youth group were attending a summer camp at the Windermere Baptist Conference Center, which was sponsored by Lifeway Christian Resources of the Southern Baptist Conference, d.b.a. Student Life.[1] While at the camp, Karlee was injured after she fell while zip-lining at The Edge, a ropes course at Windermere's Conference Center. The Richards subsequently sued Windermere and Kendra Brown, who worked at the Edge at the time of the incident, for the injuries that Karlee sustained.

This declaratory judgment action filed by Great American against Defendants, Windermere, Brown, and the Richards, principally concerns whether a Great American insurance policy provides insurance coverage for Windermere's and Brown's potential liability in the pending state court action. Mr. Richards is Karlee's father and represents her in the state court action.

---

[1] Lifeway Christian Resources of the Southern Baptist Convention does business as Student Life. The Court refers to Lifeway and Student Life interchangeably throughout the remainder of this order as simply, "Student Life."

1

The Great American Commercial General Liability policy in dispute is No. GLP 0-31-01-89-01, which was issued to Student Life by Great American. Windermere is an additional insured on that policy. The additional insured endorsement provides that Windermere is only covered for "liability arising out of the ownership, maintenance or use of that portion of the premises leased to [Student Life]" by Windermere. Doc. 35-17, p. 1 ("Endorsement"). Great American contends that Windermere is not entitled to coverage for Karlee's injuries because Windermere did not "lease" the Edge to Student Life because the Edge was not specifically mentioned in Student Life's written agreement with Windermere.

The Court previously denied Great American's motion for summary judgment on its duty to indemnify under the policy.[2] *See* Doc. 54. Defendants have now filed their own motions for summary judgment on the issue of indemnification. Docs. 56 and 58.[3] The Court grants the Defendants' motions for summary judgment.

## I. Undisputed Facts[4]

### a. The Student Life Camp at Windermere

Windermere Baptist Conference Center is a large Conference Center on the Lake of the Ozarks with over 300 acres and 126 buildings, including group lodging, a dining hall, conference space, cabins, a chapel, and a gift shop. Windermere also offers various recreational facilities

---

[2] The Court granted summary judgment to Great American on Kendra Brown's claim for coverage, Great American's duty to defend Windermere, and the untimeliness of any request for coverage of Karlee's medical bills. *See* Doc. 54. Those issues are therefore not addressed here.

[3] In opposition to Great American's motion for summary judgment, Windermere requested summary judgment in its favor pursuant to Federal Rule of Civil Procedure 56(f). To avoid any procedural confusion and to ensure that Great American had a full opportunity to respond, the Court permitted the Defendants to file their own motions for summary judgment.

[4] Unless otherwise noted, the facts recited are those which are properly supported and undisputed.

and activities at its campus, including the Edge. Organizations like Student Life use Windermere's facilities for summer church camps.

Student Life had been conducting church camps at Windermere for about ten years prior to its June 2014 camp. In January 2014, Student Life and Windermere executed an Amended Conference Contract. The "Amended Conference Contract" provides, in relevant part:

**Amended Conference Contract**

. . .
**EVENT INFORMATION**
Event Name:   Student Life #1 '14 (June 2-6, 2014)
Expected #:   1000
**Arrive Date:**  Saturday, May 31, 2014
                  (Check in begins at 3:00 PM. Rooms may not be available until 6:00 PM. . . .)
**Depart Date:**  Saturday, June 7, 2014
                  Lodging Check out time is 11:00 AM. Keys must be turned in by this time. . . .)

**LODGING INFORMATION**

| Lodging Type | Start | End | Nights | Units | Cost | Total | Minimum |
|---|---|---|---|---|---|---|---|
| Per Person (Student Life Extra) | 5/31/14 | 6/2/14 | 2 | 25 | $17.50 | $825.00 | |
| Per Person (Student Life Extra) | 6/1/14 | 6/2/14 | 1 | 15 | $17.50 | $262.50 | |
| Per Person (Student Life '14) | 6/2/14 | 6/5/14 | 4 | 1,000 | $70.00 | $70,000 | |
| **Total for Lodging:** | | | | | | **$71,137.50** | **$56,910.00** |

**You will need to provide Windermere a rooming list (names of individuals occupying each room) and a copy of your conference or retreat schedule at the time of check-in.**
. . .
**MEAL INFORMATION**
. . .                              Minimum
**Total for Meals: $76,570.00     $61,733.00**
. . .
All guests eating in the dining hall must have a meal ticket or wrist band to be admitted into the Dining Hall.
. . .
**CONFERENCE SPACE INFORMATION**

| Facility/Room | Start | End | Cost |
|---|---|---|---|
| . . . | | | |
| Wilderness Creek Auditorium (1500) | 6/1/14 8:00am | 6/6/14 12:00pm | |
| . . . | | | |
| Deer Ridge Conf Rm 1 (30) | 6/2/14 3:00pm | 6/6/14 12:00pm | |
| . . . | | | |

**Total for Conference Space: $0.00**

> Use of conference space and facilities begins at the start time stated in the contract. Conference or facility space usage time ends at the time stated in the contract and must be empty of all guests and guest items.
>
> . . .
>
> **ENTITY OBLIGATION**
> **Estimated Total Payment**   $147,707.50
> **Total Minimum Payment**   $118,643.00
>
> . . .
>
> **Property Damage/Abuse**
> The above named group will have financial responsibility for any damages and excessive wear and tear it incurs to the Windermere grounds, facilities or property to the extent that such damage or excessive wear and tear arises from the negligence or willful misconduct of the above named group. Cleanup of any facilities or grounds that are excessively dirty will be the financial responsibility of the group.

Doc. 35-5 ("Amended Conference Contract").

The Amended Conference Contract does not identify every building or activity that was available to campers during Student Life's camp at Windermere. For example, the chapel, which is made available to any group attending a camp at Windermere, is not listed. In addition, the dining hall is not specifically listed under the "Conference Space Information" heading, despite the Amended Conference Contract listing a price for meals Windermere is to provide. *See id.*

In addition, it is undisputed that Windermere offered various recreational activities to its guest campers, including those who attended the Student Life camp. Windermere also offered some special recreational activities that required an additional fee and reservations. The Edge was one such activity. The Edge, a ropes and zip-lining course, is not accessible to campers at Windermere without special scheduling, the purchase of tickets, and the execution of a "Recreational Release" form.

In addition to the Amended Conference Contract, Student Life also completed a Facility Request Form, and Windermere completed a Fax Back Response Sheet. Docs. 40-3 and 40-4. The Fax Back Response Sheet provides, in relevant part:

**Student Life Camp**
**Windermere Conference Center**

**Recreation:**

. . .

What are some free-time options on your campus?
- Sand Volleyball, Outdoor Basketball, Tennis, Mini Golf, Disc Golf, Pool, Hiking, The Edge (low/high ropes course), Paintball, Waterfront Activities (Inflatable water park, kayak, canoe, paddle boats, fishing, etc) (See attached PDF on available Recreation Packages).

Doc. 40-4, p. 3.

### b. Great American Insurance Policy

Student Life is the named insured on a Commercial General Liability policy with Great American. Windermere is listed as an Additional Insured as follows:

> **5. AUTOMATIC ADDITIONAL INSURED(S)**
> **a. Additional Insured – Manager or Lessor of Premises**
> **(1)** This policy is amended to include as an insured any person or organization (hereinafter called Additional Insured) from whom you lease or rent property and which requires you to add such person or organization as an Additional Insured
> \*\*\*
> **(2)** With respect to the insurance afforded the Additional Insured identified in **Paragraph A.(1)** of this endorsement, the following additional provisions apply:
> **(a)** This insurance applies only to liability arising out of the ownership, maintenance or use of that portion of the premises leased to [Student Life].

Doc. 35-17, p. 1 ("Endorsement").[5]

---

[5] In addition, a Certificate of Liability Insurance referenced Great American's Policy No. GLP 0310189 for Student Life and stated:

> Event: Student Life    Event Dates: May 31-June 7 and June 14-20, 2014
>
> Windermere Conference Center is included as Additional Insured on the General Liability policy, as per endorsement #CG 82 24, ed. 12/01, and on the Automobile Liability policy, as per endorsement #CA 8518, ed. 6/09.

5

### c. The Underlying Lawsuit

The Searcy Baptist Church youth group was one of the groups of campers that attended Student Life's camp at Windermere in June of 2014. Karlee and the rest of the Searcy youth group were scheduled to ride The Edge on June 4, 2014. They paid Windermere an additional fee for this activity. While zip-lining at The Edge, Karlee fell and was injured.

Following Karlee's accident at The Edge, her father, Jeremy Richards, both individually and as Next Friend, brought suit against Windermere. A lawsuit is currently pending in Jasper County Circuit Court which seeks damages for Karlee's physical injuries sustained at The Edge.

On November 17, 2015, Windermere and Kendra Brown tendered claims to Great American for defense and indemnity of the underlying lawsuit, seeking coverage as additional insureds under Student Life's Great American policy. In its February 4, 2016 denial letter to Windermere, Great American concluded that Karlee's accident did not arise out of the ownership, maintenance, or use of the premises Windermere leased to Student Life and denied Windermere's tender.

### II. Discussion

Great American's complaint asks for a declaratory judgment that Great American owes no duty to indemnify Windermere for any liability on the claims in the underlying state court action. As previously discussed, the Court has denied Great American's motion for summary judgment on that claim. Defendants now move for summary judgment on that claim, arguing that Great American cannot succeed on it as a matter of law.

---

The Certificate of Liability Insurance was issued by Arthur Gallagher, Student Life's broker, at Student Life's request. However, because there appears to be a dispute as to whether Gallagher was an agent of Great American, the Court does not rely on the Certificate of Insurance to grant summary judgment to the Defendants.

A movant is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The rule requires summary judgment to be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

A federal court sitting in diversity applies the choice-of-law rules of the state where the court sits, in this case, Missouri. *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496 (1941); *American Guarantee Liability Ins. Co. v. U.S. Fidelity & Guaranty Co.,* 668 F.3d 991, 996 (8th Cir. 2012). A court need not undertake a choice-of-law inquiry unless an actual conflict of law is demonstrated. *Prudential Ins. Co. of Am. v. Kamrath,* 475 F.3d 920, 924 (8th Cir. 2007) (citation omitted). Because the parties do not raise any actual conflict and because they do not dispute that Missouri law applies, the Court applies Missouri law.[6]

### a. Ripeness

Great American contends that Defendants' request for summary judgment on the issue of indemnification is not ripe because there has been no judgment against Windermere in the underlying state court lawsuit. According to Great American, the lawsuit against Windermere was actually dismissed without a finding of liability. Great American suggests it would be a waste of judicial resources to resolve the question of whether there is insurance coverage under these circumstances, citing *Amerisure Mut. Ins. Co. v. Paric Corp.*, No. 04-0430, 2005 WL

---

[6] Great American states that no choice of law analysis is necessary because the outcome is the same under the law of the three states that could potentially apply: Missouri, Tennessee, and Alabama. Because Windermere and Richards contend that Missouri law should apply, the Court concludes that the parties agree to the application of Missouri law.

2708873 (E.D. Mo. Oct. 21, 2005) (quoting *In re Bender,* 368 F.3d 846, 848 (8th Cir. 2004)). It contends that addressing the issue of coverage in the absence of a judgment regarding the underlying tort would render the Court's opinion merely advisory, citing *Shapiro Sales Co. v. Alcoa, Inc.*, No. 06-0638, 2006 WL 2228987 (E.D. Mo. Aug. 3, 2006) (quoting *Paric Corp.*, 2005 WL 2708873, at *9).

Great American's position is remarkably contrary to the position it took when asking the Court to rule that it was entitled to summary judgment on its claims and when it opposed any stay of its declaratory judgment action pending resolution of liability and damages in state court. But even if had not taken such inconsistent positions, the Court would find that the indemnity coverage issue remains ripe.

The Court is not being asked to enter judgment as to what is owed under Great American's insurance policy. It is being asked to declare that there is no indemnity coverage under the policy. The Eighth Circuit has made it clear that "a declaratory judgment action is ripe irrespective of whether the underlying litigation is ongoing or resolved. . . . The insured has made a demand on the insurer, and the insurer has contended that there are no circumstances under which it can owe the insured any money. The lines are drawn, the parties are at odds, the dispute is real." *Scottsdale Ins. Co. v. Universal Crop Prot. All., LLC*, 620 F.3d 926, 934 (8th Cir. 2010) (quotation marks and citation omitted).

Windermere made a demand for coverage and Great American denied the demand for coverage. The dispute is real and ripe just as it was when Great American filed this suit.[7]

---

[7] Defendants have also confirmed that the Richards have brought, and there currently is pending, an action in state court against Windermere for torts. Great American has not disputed this fact.

8

### b. Interpretation of Insurance Policies in Missouri

The interpretation of an insurance policy is a "question of law" to be determined by the Court. *See Mendota Ins. Co. v. Lawson,* 456 S.W.3d 898, 903 (Mo. App. 2015). The ultimate goal of contract interpretation is to determine the intent of the parties. *See Bolinger v. Clarks Mut. Ins. Co.*, 485 S.W.3d 803, 809 (Mo. App. 2016). To that end, the language in the contract is to be read according to its plain and ordinary meaning. *See Mendota*, 456 S.W.3d at 903.

"Whether an insurance policy is ambiguous is a question of law." *Todd v. Mo. United Sch. Ins. Council*, 223 S.W.3d 156, 160 (Mo. banc 2007). In interpreting an insurance policy, "[t]he key is whether the contract language is ambiguous or unambiguous." *Id*. "'To test whether the language used in the policy is ambiguous, the language is considered in the light in which it would normally be understood by the lay person who bought and paid for the policy.'" *Blumer v. Automobile Club Inter–Ins. Exch.*, 340 S.W.3d 214, 218 (Mo. App. 2011) (quoting *Heringer v. Am. Family Mut. Ins. Co.,* 140 S.W.3d 100, 103 (Mo. App. 2004)). "'An ambiguity exists when there is duplicity, indistinctness, or uncertainty in the meaning of the language of the policy.'" *Fanning v. Progressive Northwestern Ins. Co.,* 412 S.W.3d 360, 364 (Mo. App. 2013) (quoting *Seeck v. Geico Gen. Ins. Co.,* 212 S.W.3d 129, 132 (Mo. banc 2007)). If an ambiguity exists, the policy language will be construed against the insurer. *See Mendota*, 456 S.W.3d at 903.

"[T]he parties seeking to establish coverage under the insurance policy have the burden of proving that the claim is within the coverage afforded by the policy . . . even though they are denominated as defendants in a declaratory judgment action." *State Farm Fire & Cas. Co. v. D.T.S.*, 867 S.W.2d 642, 644 (Mo. App. 1993).

### c. Interpretation of Section 5.a.(2)(a)

The Great American policy's declarations page lists Student Life as the named insured. Windermere is listed as an additional Insured as follows:

> **5. AUTOMATIC ADDITIONAL INSURED(S)**
> **a. Additional Insured – Manager or Lessor of Premises**
> > **(1)** This policy is amended to include as an insured any person or organization (hereinafter called Additional Insured) from whom you lease or rent property and which requires you to add such person or organization as an Additional Insured
> > ***
> > **(2)** With respect to the insurance afforded the Additional Insured identified in **Paragraph A.(1)** of this endorsement, the following additional provisions apply:
> > > **(b)** This insurance applies only to liability arising out of the ownership, maintenance or use of that portion of the premises leased to [Student Life].

Doc. 35-17, p. 1 ("Endorsement").

Great American contends that the reference in Section 5.a.(2)(a) to "premises leased to you" refers to the specific places identified in the Amended Conference Contract between Windermere and Student Life. According to Great American, because the Edge is not listed, Windermere's potential liability for the accident at the Edge is not covered. In contrast, Windermere argues that "premises leased" includes all the places on its property that Student Life campers were authorized to access, including the Edge.

The key phrase to be interpreted and applied is, "portion of the premises leased to [Student Life]." Counsel for Great American argues that the term "premises lease" is understood by everyone to be premises over which one has exclusive or near-exclusive control. Doc. 55, Oral Argument Transcript, pp. 3-4. In contrast, Windermere argues that all of the documents surrounding the formation of the insurance policy demonstrate that an ordinary lay person would not intend the term "premises leased" to mean premises over which one has exclusive use, but

instead, would expect the term to cover all of the Windermere property that Student Life campers had access to during Student Life's church camp.

Under Missouri law, a lease gives to the lessee exclusive use of property for a determined period of time.[8] *Chubb Group of Ins. Cos. v. C.F. Murphy & Associates, Inc.*, 656 S.W.2d 766, 777 (Mo. App. 1983). The term "lease" gives rise to a landlord-tenant relationship, whereby the tenant has "exclusive possession of the premises as against all the world," including the landlord. *Santa Fe Trail Neighborhood Redevelopment Corp. v. W.F. Coehn & Co.*, 154 S.W.3d 432, 439 (Mo. App. 2005) (internal quotation marks and citations removed). In contrast, "[a] license is only a privilege to enter certain premises for a specific purpose." *Kimack v. Adams*, 930 S.W.2d 505, 507 (Mo. App. 1996). The difference between a lease and a license is technical and difficult to determine. *See Santa Fe*, 154 S.W.3d at 439.

When there is a conflict between the technical definition of a term in a policy and what a lay person would understand, the lay definition controls unless it is obvious that a technical definition was intended. *See Mansion Hills Condo. Ass'n v. Am. Fam. Mut. Ins. Co.*, 62 S.W.3d 633, 638 (Mo. App. 2001). "To determine the [lay definition] of a term, courts will consult standard English language dictionaries." *Id.*

Merriam Webster's New College Dictionary defines "leased" as "property occupied or used under the terms of a lease." Webster's II New College Dictionary (1995). "Lease" is defined as "a contract granting occupation or use of property during a certain period in exchange for a specified rent." *Id.* Thus, the lay definition does not indicate that the possession is exclusive.

---

[8] Great American did not cite any case that says "near exclusive" possession is enough, and the Court has found no such statement in Missouri law.

Plainly, there is a conflict between the lay definition of "lease" and the technical definition of the term. When there is such a conflict, the technical definition does not control unless it is shown that the parties intended the technical definition. *See Mansion Hills*, 62 S.W.3d at 638. Great American has presented neither language in the policy nor other evidence to show that Windermere, Student Life, or Great American intended the term "lease" to have a technical meaning.

Accordingly, the Court concludes that the phrase "premises leased" refers to that portion of Windermere's camp which Student Life could use pursuant to the terms of the Amended Conference Contract.

### d. Application of Section 5.a.(2)(a)

To determine whether Great American's request for declaratory judgment on its duty to indemnify survives summary judgment, the Court must consider the Amended Conference Contract between Windermere and Student Life. That contract determines what portion of Windermere's property was "leased" to Student Life, *i.e.*, what portion of Windermere's property could be used by Student Life campers.

As previously stated, the Edge is not specifically mentioned in the Amended Conference Contract. However, the contract begins with the phrase "Event Information" and goes on to identify Student Life as the event name and the expected number as 1000. It then describes the housing and meals to be provided and the payment to be made by Student Life. It also has a section headed "Property Damage/Abuse," which states:

> **Property Damage/Abuse**
> The above named group will have financial responsibility for any damages and
> excessive wear and tear it incurs to the Windermere grounds, facilities or property
> to the extent that such damage or excessive wear and tear arises from the
> negligence or willful misconduct of the above named group. Cleanup of any

> facilities or grounds that are excessively dirty will be the financial responsibility of the group.

Doc. 35-5 ("Amended Conference Contract"), p. 4.

Whether this contract gives Student Life the right to use more than the lodging and meals that are expressly listed in the contract requires the Court to consider whether the Amended Contract contains a latent ambiguity. Under Missouri law, a latent ambiguity exists when a contract "on its face appears clear and unambiguous, but some collateral matter makes the meaning uncertain." *Royal Banks of Mo. v. Fridkin*, 819 S.W.2d 359, 362 (Mo. banc 1991). In other words, an ambiguity is "latent if language, which is plain on its face, becomes uncertain upon application." *Gen. Am. Life Ins. Co. v. Barrett*, 847 S.W.2d 125, 131 (Mo. App. 1993). For example, "[a] latent ambiguity may be one in which the description of the property is clear upon the face of the instrument, but it turns out that there is more than one estate to which the description applies; or it may be one where the property is imperfectly or in some respects erroneously described, so as not to refer with precision to any particular object." *Muilenburg, Inc. v. Cherokee Rose Design & Build, LLC*, 250 S.W.3d 848, 854 (Mo. App. 2008) (quotation marks and citation omitted).

The case of *Royal Banks of Mo. v. Fridkin*, 819 S.W.2d 359 (Mo. banc 1991) provides another example. In *Royal Banks*, the Missouri Supreme Court found a latent ambiguity in an otherwise unambiguous contract where the contract described a $10,000.00 promissory note but where no $10,000.00 promissory note actually existed. *See id.* at 362. Looking to extrinsic evidence, the court concluded, "Evidence of a promissory note that fits the description in the guaranty in all respects except for principal amount, coupled with the fact that a $10,000.00 note did not exist, is a collateral matter that renders the meaning of the guaranty uncertain. Once it

became apparent that there was no $10,000.00 note but instead only a $50,000.00 note, a latent ambiguity existed." *Id.*

Although parole evidence ordinarily may not be considered to create an ambiguity, the Court may consider such evidence to demonstrate the existence of collateral matters that create a latent ambiguity. *See Royal Banks of Mo. v. Fridkin*, 819 S.W.2d 359, 362 (Mo. banc. 1991) ("A latent ambiguity is not apparent on the face of the writing and therefore, must be developed by extrinsic evidence.").

First, the plain language of the Amended Conference Contract alludes to Student Life's use of and access to more properties than merely conference space and lodging units during its "event." For example, the Contract's plain language contemplates Student Life's use of a dining hall[9] because the meals they contracted for were to be served there. Yet, the Contract does not specifically list the dining hall. The Contract also references Student Life's use of "the Windermere grounds, facilities or property . . . ." Doc. 35-5 ("Amended Conference Contract"), p. 4. On its face, this language implies that Student Life will be using more than just the lodging and conference rooms.

Second, interpreting the term "event" in the Amended Conference Contract as permitting Student Life campers to use only the conference space and the dorm rooms would be inconsistent with the circumstances surrounding the formation of the contract. Windermere contracts with church groups that conduct summer church camps at the Windermere facility. It is undisputed that Student Life has been conducting church camps at Windermere for the last ten years. Student Life's official name is "Lifeway Christian Resources of the Southern Baptist

---

[9] The Contract's "Meal Information" section provides start and end times for specific meals and alludes to Student Life's use of the Dining Hall, stating, "All guests eating in the dining hall must have a meal ticket or wrist band to be admitted into the Dining Hall." Doc. 35-5 ("Amended Conference Contract"), p. 2.

Convention," and Windermere identifies itself as a "Baptist Conference Center". A church camp contemplates use of the chapel as well as recreational activities, in addition to housing and food. No reasonable juror could find otherwise.[10]

The Fax Back Response Sheet exchanged between Windermere and Student Life also indicates what facilities would be available to Student Life for its camp. This document confirms that the purpose of the parties' agreement was to host an event, described as "Student Life Camp." Doc. 40-4, p. 1. Thus, the use of the term "event" in the Amended Conference Contract was not intended to refer to an event conducted in conference rooms with lodging and meals. Rather, the event was a camp for 1000 campers.

---

[10] The interpretation of a contract, including any latent ambiguity, "is a question of law." *Denny v. Regions Bank*, No. 34697, 2017 WL 4129130, at *3 (Mo. App. Sept. 19, 2017) (quotation marks and citation omitted). Once the Court finds an ambiguity, the objective reasonable expectations doctrine applies. *See Burns v. Smith*, 303 S.W.3d 505, 512 (Mo. banc 2010) ("When there is an ambiguity, insureds are entitled to a resolution of that ambiguity consistent with their objective and reasonable expectations as to what coverage would be provided.") (quotation marks and citation omitted). Thus, the Court must "apply[] the meaning which would be attached by an ordinary person of average understanding if purchasing insurance." *Id.* at 511 (quotation marks and citation omitted). The subjective intent of the parties is not relevant. *See id.*, 303 S.W.3d at 508 (refusing to "engag[e] in a fact-based analysis of each party's subjective intent and interpretation of the contract," noting "long-settled black-letter law requiring ambiguities in a policy to be resolved in favor of the insured"). Therefore, whether Windermere's president recalls asking Student Life or anyone else to provide insurance for the Edge is irrelevant.

Moreover, the understanding or intention of Windermere's president with respect to the insurance contract between Great American and Student Life is irrelevant. Windermere is an additional insured, and therefore a third-party beneficiary—not a party to the contract. *See Herd v. Am. Sec. Ins. Co.*, 556 F. Supp. 2d 992, 996–97 (W.D. Mo. 2008). Windermere's intent with respect to the scope of the insurance contract therefore is of no matter here. Similarly, Windermere's president's understanding of what constituted the "premises leased"—a term in the insurance contract to which Windermere indisputably was not a party—is irrelevant.

In any event, even if there were disputed issues of fact, no reasonable juror could find on this record that Student Life campers could not access the Edge as part of the Student Life camp being conducted on Windermere property.

In addition, the Fax Back Response Sheet shows the parties' understanding that Student Life's campers would have access to not only conference and dorm space, but also to a church for worship, recreational fields, a gymnasium, hiking trails, a body of water for "waterfront activities," and as is relevant in this case, The Edge ropes course:

> What are some free-time options on your campus?
> - Sand Volleyball, Outdoor Basketball, Tennis, Mini Golf, Disc Golf, Pool, Hiking, *The Edge (low/high ropes course)*, Paintball, Waterfront Activities (Inflatable water park, kayak, canoe, paddle boats, fishing, etc) . . . .

Doc. 40-4, p. 3 (emphasis added); *see generally* Doc. 40-4.

Because Student Life was contracting with Windermere for an event—to host a camp complete with various camp activities and church facilities—the agreement was not limited to the lodging and meals specifically listed in the Amended Conference Contract. The extrinsic evidence and the implications of the Amended Conference Contract language establish that there is a latent ambiguity to the extent that the Contract could be interpreted to limit access to only the dorm rooms and the conference space. Student Life contracted with Windermere to use Windermere's recreational facilities, including the Edge, as part of a church camp. Therefore, Great American's claim for declaratory judgment on the issue of indemnification must fail because it cannot show that Windermere is not entitled to indemnity under the Great American policy for any liability arising out of injuries Karlee sustained while using the Edge.

Great American's cited authorities do not require a different outcome. First, the coverage disputes in many of Great American's authorities center on how to interpret "arising out of," without any dispute as to what properties the parties understood to be the "leased premises" covered by the additional-insured endorsement at issue. In contrast to the facts before this Court, each of these cases involved an undisputed lease contract between a landlord and tenant, rather than an event contract between two organizations, and there was no dispute or ambiguity

16

surrounding what property was meant by the "premises leased" or a similar term. *See, e.g., Belz Park Place v. P.F. Chang's China Bistro, Inc.*, No. 12-2656, 2015 WL 11145058 (W.D. Tenn. Mar. 23, 2015) (interpreting insurance contract within context of landlord-tenant relationship involving a lease contract, and where there was no dispute about what comprised the leased premises); *Liberty Mut. Ins. Co. v. Michigan Mut. Ins. Co.*, 891 N.E.2d 99 (Ind. Ct. App. 2008) (same); *Northbrook Ins. Co. v. American States Ins. Co.*, 495 N.W.2d 450 (Minn. Ct. App. 1993) (same); *Hilton Hotels Corp v. Employers Ins. of Wausau*, 629 So. 2d 1064 (Fla. Dist. Ct. App. 1994) (same); *SFH, Inc. v. Millard Refrigerated Svcs., Inc.*, 339 F.3d 738 (8th Cir. 2003) (same).

For example, in *U.S. Fidelity & Guar. v. Drazic*, 877 S.W.2d 140 (Mo. App. 1994). the Missouri Court of Appeals considered additional-insured coverage within the context of a landlord-tenant relationship and an unambiguous lease contract. The Drazics leased a portion of their basement to the Brewers, and the Drazics were named as additional insureds under the Brewers' liability insurance policy. *Id.* at 141. After the Brewers' employee fell in a parking lot near the Drazics' building and injured herself, she filed suit alleging that the Drazics negligently discharged steam from their dry cleaning business, which formed ice on the parking area causing her fall. *Id.* at 141-42. The policy's additional-insured endorsement provided coverage to the Drazics as additional insureds, "but only with respect to liability arising out of the ownership, maintenance or use of that part of the premises *designated below leased to the named insured.*" *Id.* at 142 (emphasis added). The court considered the parties' lease contract, which identified the premises leased as a "designated portion of a commercial building known and numbered as 418 Manchester Road, Ballwin, Missouri 63011, plus the area adjacent to the entrance of Brewer's Quilt Shop for installation of their office." *Id.* The court reasoned that the endorsement's "plain language . . . contemplates coverage for the Drazics as additional insureds

17

for liability arising out of incidents taking place in that part of the building leased to the Brewers pursuant to the lease contract" and that there was no coverage because the accident at issue "took place on a parking area outside the building." *Id.* at 143.

In contrast to *Drazic*, the Great American policy does not limit coverage to the "premises designated below" while accompanied by a lease that specifically identifies an address or description of the area unambiguously covered by the clause. Also in contrast to the facts before this Court, there was no dispute or uncertainty in *Drazic* about what was meant by the "premises . . . leased."

The other cases cited by Great American are distinguishable because they involve starkly different contract language than the ambiguous term "premises leased." *See, e.g., Lancaster v. Ferrell Paving, Inc.*, 397 S.W.3d 606 (Tenn. Ct. App. 2012) (involving different endorsement language: "liability arising out of your *ongoing operations performed for* th[e] [additional] insured") (emphasis added). Finally, Great American's reliance on contract cases outside of the insurance context is misplaced because they interpret provisions that are unlike the policy language at issue here. *See, e.g., Once Upon a Time, LLC v. Chappelle Properties, LLC*, 209 So. 3d 1094 (Ala. 2016) (applying Alabama law to an indemnity agreement, not an insurance policy, that did not contain the language "arising out of" or "premises leased"); *Union Realty Co., Ltd. v. Family Dollar Stores of Tennessee, Inc.*, 255 S.W.3d 586 (Tenn. Ct. App. 2008) (interpreting contract language regarding the landlord's and tenant's obligations to procure insurance, but not insurance policy language at issue); *Pilla v. Tom-Boy, Inc.*, 756 S.W.2d 638 (Mo. App. 1988) (interpreting indemnity provision in a lease that did not contain the language "arising out of" outside of insurance context and where there was no dispute as to what constituted the leased premises).

18

Finally, the Court rejects Great American's separate argument that whether a tenant has "shared" versus "exclusive" use of an area controls whether that area is part of the "premises leased" covered by an insurance endorsement. For example, in *Colony Ins. Co. v. Pinewoods Enters., Inc.*, 29 F. Supp. 2d 1079 (E.D. Mo. 1998), a district court found insurance coverage for liability arising out of an area shared between the additional insured and other parties. In that case, the lessee Bledsoe and Pinewoods entered a leasing contract in which Bledsoe leased portions of Pinewood's campgrounds for a concert. *Id.* at 1081. Pinewoods was named as an additional insured under Bledsoe's general liability policy with Colony Insurance. *Id.* During the concert, a rain storm caused many of the concert goers to take shelter on and under a deck attached to a lodge at the campground. *Id.* The lodge's deck collapsed, injuring numerous concertgoers. *Id.* At issue was whether Colony Insurance's coverage of Pinewoods as an additional insured extended to this accident. *Id.*

The court considered both the insurance policy endorsement and the parties' lease contract. The endorsement provided additional insured coverage "but *only with respect to liability arising out of your [Bledsoe's] operations or premises owned by or rented to you.*" *Id.* at 1082. The leasing contract specifically provided that Bledsoe "shall have the exclusive use of the Pinewoods Park" for a specific time period with the exception of the Lodge area. *Id.* at 1081-82. The contract also provided:

> (5) LESSEE [Bledsoe], its customers, guests and invitees will share the Lodge area and facilities, i.e. store, gift shop, bait and tackle area . . . with the fishermen and permanent guests and any campers reserved prior to June 10, 1995.

*Id.* at 1082. The court concluded that Bledsoe leased the lodge area because the contract "specifically (*albeit not exclusively*) lease[d] the lodge area to Bledsoe," and the endorsement provided that coverage extended to "the premises owned by or rented to you." *Id.* at 1083

(emphasis added). The court concluded that "Colony's additional insured endorsement extend[ed] coverage to Pinewoods for any liability arising out of the collapse of the lodge's deck because the lodge was part of the premises leased to Bledsoe." *Id.* In contrast to Great American's contention that exclusivity is required, the *Colony* court still found the lodge premises to be "rented to" Bledsoe for purposes of additional insured coverage, despite the fact that the parties' lease agreement provided that Bledsoe would "*share*" the lodge area premises at issue "with the fishermen and permanent guests and any campers." *Id.* (emphasis added).

*Colony* supports this Court's conclusion that Great American cannot obtain a declaratory judgment on the issue of indemnification. Student Life campers had shared access to the Edge just as the campers in *Colony* had shared access to the lodge. The fact that Student Life did not control the Edge does not mean that Great American owes no duty to indemnify.

### III. Conclusion

For the reasons set forth above, the motions by Windermere and the Richards for summary judgment are granted.

s/ Nanette K. Laughrey  
NANETTE K. LAUGHREY  
United States District Judge

Dated: October 23, 2017  
Jefferson City, Missouri